**ARROW–HART & HEGEMAN ELECTRIC CO. v. FEDERAL TRADE COMMISSION.**
No. 183.

Circuit Court of Appeals, Second Circuit.
May 29, 1933.

See, also, 63 F.(2d) 108.

Charles Neave, of New York City, and Arthur L. Shipman, Charles Welles Gross, and Wallace W. Brown, all of Hartford, Conn., for petitioner.

Robt. E. Healy, Chief Counsel, Federal Trade Commission, Martin A. Morrison, Asst. Chief Counsel, Federal Trade Commission, and Everett F. Haycraft, all of Washington, D. C., for respondent.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

Respondent entered an order on a complaint filed under section 7 of the Clayton Act (15 USCA § 18) directing the Arrow-Hart & Hegeman Electric Company to divest itself of the common stock of Hart & Hegeman Manufacturing Company and Arrow Electric Company, two corporations engaged in the manufacture of electrical devices in competition in interstate commerce. Both manufacturing corporations had issues of preferred stocks which were not transferred and which were part of the corporations' obligations as hereinafter stated.

The Hart & Hegeman Manufacturing Company was incorporated in 1891, under the laws of Connecticut, having common and preferred stock. The Arrow Electric Company was organized under the Connecticut laws in 1903 and it had both common and preferred stock. Its preferred stock was non-voting except on six consecutive defaults of quarterly dividends. The common stocks of both corporations were closely held. Both corporations were engaged in the manufacture and sale of electrical wiring devices and were in direct and substantial competition. The respondent found that 59 per cent. of the Hart & Hegeman Manufacturing Company's sales were in competition with the Arrow Electric Company sales in 1927. The combined total sales of the two companies in 1927 was 24 per cent. of the total sales of the entire electrical wiring device industry.

Pursuant to an agreement of August 6, 1927, of the common stockowners of both manufacturing companies, and as a part of the plan to join the companies, the Hart & Hegeman Manufacturing Company's old preferred stock and also a preferred issue of the H. T. Paiste Company, its subsidiary, were retired and a preferred nonvoting stock and additional common stock were issued. Thereafter both Hart & Hegeman Manufacturing Company and the Arrow Electric Company had outstanding preferred stock. On October 6, 1927, Arrow-Hart & Hegeman, Inc. (the holding company), was organized under the Connecticut laws with an authorized capital stock of $2,000,000 of $10 par common stock. On October 10, 1927, Arrow-Hart & Hegeman, Inc., acquired the 20,000 shares of Hart & Hegeman Manufacturing Company common voting stock in exchange for 80,000 shares of its stock, and acquired the 30,000 shares of the Arrow Electric Company common voting stock in exchange for 120,000 shares of its common stock. It did not, however, acquire any of the two companies' preferred stock.

On March 3, 1928, the respondent issued its original complaint against Arrow-Hart & Hegeman, Inc., charging violations of section 7 of the Clayton Act (15 USCA § 18). On September 7, 1928, this holding company filed an answer, and on November 10, 1928, its directors recommended dissolution and distribution of its assets, consisting of the Arrow Electric Company and the Hart & Hegeman Manufacturing Company common stock to the shareholders. A notice to the stockholders recommending such dissolution inclosed a form of proxy and consent to the plan of dissolution and expressed the view that efficiency and economy would be promoted by "actual merger and consolidation of the two companies." The stockholders' meeting was called for December 10, 1928. To avoid federal tax on liquidation, all the shares of common stock of the Arrow Electric Company then held by Arrow-Hart & Hegeman, Inc., were transferred to Arrow Manufacturing Company, a holding company for tax purposes, and in consideration therefor the tax company issued all its capital stock to the stockholders of Arrow-Hart & Hegeman, Inc. All the shares of the common stock of the

Hart & Hegeman Manufacturing Company then held by Arrow-Hart & Hegeman, Inc., were transferred to H. & H. Electric Company, another tax company, and in consideration of this transfer the tax company issued all its capital stock directly to the stockholders of Arrow-Hart & Hegeman, Inc. These stockholders thus received the stock of the two tax companies. Arrow-Hart & Hegeman, Inc., then had no assets and was dissolved. The four corporations, the two manufacturing and the two tax companies, agreed to merge or consolidate, and did so on December 31, 1928, under the Connecticut laws, into the Arrow-Hart & Hegeman Electric Company, petitioner. The preferred stock of Arrow Electric Company and Hart & Hegeman Manufacturing Company constituted nearly 73 per cent. of their total par value capitalization, and was in no way concerned with the organization or dissolution of Arrow-Hart & Hegeman, Inc., or with the formation of the tax companies. The capitalization of the petitioner was $2,000,000 $10 par value common stock and $3,228,300 of $100 par value preferred stock; 18,950 shares of preferred stock were issued for the Arrow Electric Company preferred and 13,333 shares for Hart & Hegeman Manufacturing Company preferred; and 100,000 shares of common stock were issued for H. & H. Electric Company common stock and 100,000 shares for Arrow Manufacturing Company common stock (then held by Arrow-Hart & Hegeman, Inc., stockholders' representatives).

On January 1, 1929, the board of directors of the petitioner held its first meeting, and on January 28 the stockholders held their first meeting. On June 29, 1929, the respondent issued a supplemental complaint naming the petitioner as a new respondent and alleging that the original respondent Arrow-Hart & Hegeman, Inc., had formed petitioner by the consolidation of the manufacturing and tax companies. The respondent found that the acquisition of the stock by Arrow-Hart & Hegeman, Inc., and the petitioner's acquisition of the assets of the manufacturing companies may have the effect of lessening competition between them and may restrain commerce in the electrical wiring device industry and has the tendency to create a monopoly.

The respondent concluded that the acquisition of stock by Arrow-Hart & Hegeman, Inc., and the voting of said stock which culminated in the organization of the petitioner constituted a violation of section 7 of the Clayton Act (15 USCA § 18). The second paragraph of section 7 reads:

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be to substantially lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

The order entered herein directs the petitioner to divest itself of stocks and assets of both manufacturing companies. Section 7 of the Clayton Act, upon which the prosecution is based, addresses itself to the stock acquisition only, and section 11 of the act (15 USCA § 21) gives the respondent power over a corporation violating the act to issue an order requiring it to cease and desist from the violation by divesting itself of the common stock held.

Congress intended to prevent, by section 7, a corporate control which could be concentrated by prohibited acquisition of stock. Wrongful acquisition of the stock facilitates a merger or consolidation of assets. When ordered to divest itself of stock, the utmost good faith should be used by a corporation in order to remove as far as possible the corporate concentration of ownership caused by the wrongful acquisition of stock. One method of divestiture would be to restore the exact status existing before the wrongful acquisition by distributing the stock acquired to its owners before acquisition. It should be recognized that, where shares of corporations which pass from one owner to another are being considered it would be difficult, if not impossible, to transfer the stock to the identical group of shareholders who held the stock prior or to the formation of the holding corporation. The stock wrongfully acquired might be sold to third parties. The holding company might have distributed its assets, consisting of stock of the competing companies, to its own stockholders in such a manner that each stockholder would have shares of both competing companies. For example, Arrow-Hart & Hegeman, Inc, in exchange for the surrender in dissolution of its 200,000 shares, might have distributed the 30,000 common shares of Arrow Electric Company and the 20,000 common shares of Hart & Hegeman Manufacturing Company in a ratio of 3 Arrow and 2 Hart & Hegeman for 10 Arrow-Hart & Hegeman, Inc. Corporate control would be removed, but some measure of com-

mon ownership and common interest of a group of individuals in both competing companies would remain. That common ownership would be a result of the unlawful acquisition by the holding company and would facilitate a later merger or consolidation of the competing companies brought about by the individuals without any further intervention of the holding company.

■ But if the merger by transfer of assets is completed before the Federal Trade Commission filed its complaint, it cannot be attacked under the Clayton Act (38 Stat. 730). Thatcher Mfg. Co. v. Fed. Trade Comm., 272 U. S. 554, 47 S. Ct. 175, 71 L. Ed. 405.

Whether, under the rule of Fed. Trade Comm. v. Western Meat Co., 272 U. S. 554, 47 S. Ct. 175, 71 L. Ed. 405, common ownership in individuals would be sufficient or, in addition, continued corporate control would be required to render the merger or consolidation objectionable and subject to action by the respondent, we need not decide, because in the instant case both factors of common ownership and corporate control of even the details of the complete consolidation are present. The stock of the competing companies was retained in common ownership until the consolidation was completed.

And Arrow-Hart & Hegeman, Inc., did not distribute Arrow Electric Company and Hart & Hegeman Manufacturing Company stock to its stockholders free from any plan of consolidation, but it did distribute the stock to the Arrow Manufacturing Company and H. & H. Electric Company, respectively, found by the respondent to have been established for tax purposes. Since that was their purpose, and since each tax company only held the stock of one manufacturing company, the plan would seem to be no more objectionable than direct distribution of Arrow Electric Company and Hart & Hegeman Manufacturing Company stock to the Arrow-Hart & Hegeman, Inc., stockholders, if the tax companies' stock had been distributed to the Arrow-Hart & Hegeman, Inc., stockholders directly. But the tax companies' stock was not distributed to the Arrow-Hart & Hegeman, Inc., stockholders to merge or consolidate the four companies as they pleased free from control of Arrow-Hart & Hegeman, Inc. The letter of November 10, 1928, from Arrow-Hart & Hegeman, Inc., to its stockholders advised dissolution and distribution of stock of Arrow Electric Company and Hart & Hegeman Manufacturing Company in kind to the stockholders. Proxies for that

purpose were inclosed. The letter stated the belief that after distribution of the stock and liquidation of Arrow-Hart & Hegeman, Inc., a consolidation would be proposed by the separate manufacturing companies, and expressed a confidence that efficiency and economy would be prompted by consolidation.

■ After the tax companies were formed by Arrow-Hart & Hegeman, Inc., on November 30, 1928, a supplemental letter was sent to the stockholders on December 1, 1928. This letter outlined the entire plan of reorganization, including the final steps for formation of the petitioner by consolidation and inclosed proxies authorizing six persons to act for the stockholders at a stockholders' meeting on December 6, 1928, to carry out the entire plan. The proxies authorized the named persons to receive the tax companies' stock and to exchange it for the stock of the consolidated company, the petitioner. By the exercise of these proxies the stockholders adopted the plan on December 6, 1928, and on the same day Arrow-Hart & Hegeman, Inc., transferred the stock of the manufacturing companies to the tax companies. Thus the stockholders of Arrow-Hart & Hegeman, Inc., were requested to and did accept the entire plan for formation of the petitioner before Arrow-Hart & Hegeman, Inc., divested itself of the manufacturing companies' stock. On December 31, 1928, at stockholders' meetings of the tax and manufacturing companies, the common shareholders being represented by their proxies, the plan was carried out and the petitioner was formed. This supplemental letter of December 1, 1928, and the inclosed proxies not only proposed a plan, but went further. By the letter and the use of the proxies, Arrow-Hart & Hegeman, Inc., dictated and controlled the formation of the petitioner, and therefore the petitioner comes under the jurisdiction and is subject to the order of the respondent. Fed. Trade Comm. v. Western Meat Co., 272 U. S. 554, 47 S. Ct. 175, 71 L. Ed. 405.

■ Divestiture of stock must be actual and complete, and may not be effected by using the control resulting therefrom to secure title to the possessions of the competing companies' property. The purpose to be attained is to avoid the possibility of permitting consolidation or merger which substantially lessens competition in trade by the use of the stock held in merged ownership. United States v. New England Fish Exchange (D. C.) 258 F. 732, 746. The control which Arrow-Hart & Hegeman, Inc., was able to and did exercise

by ownership of the common stock even though there was outstanding in preferred stock 72 per cent. of the par value of the manufacturing companies' total stock issued, is a clear example of unlawful stock control providing the effect has been to substantially lessen competition.

We think section 11, requiring a divestiture of stock when section 7 is breached, contemplates also a divestiture of the transfer of the assets which came about through the ownership and use of the stock unlawfully held by the holding company. The supplemental complaint filed June 29, 1929, could reach what was done by the formation of the petitioner and the transfer of assets to it. The powers of the respondent, confined as they are by the original and supplemental complaint to a violation of section 7, are sufficient to require not only divestiture of stock, but also the divestiture of assets obtained through the means of stock ownership.

In 1927 the entire industry sold $32,703,331 of the kind of products produced by the manufacturing companies. The Arrow Electric Company sales amounted to $3,849,000 and those of the Hart & Hegeman Manufacturing Company amounted to $4,537,000. In 1929 the sales of the entire electrical wiring device industry amounted to $43,120,095, of which the Arrow Electric Company had $3,584,000 and the Hart & Hegeman Manufacturing Company $4,599,000. The total sales for 1928 were not proved, but the combined sales of both companies for 1927 were about 24 per cent. of the industry's total sales for that year. There is evidence to support the conclusion of the respondent that there was a tendency to restrain trade in the discontinuance of the competition between the two manufacturing companies.

Competition connotes more than mere rivalry between salesmen selling different brands of products of the same quality, at the same price, and manufactured by the same company. Sinclair Refining Co. v. Federal Trade Comm., 276 F. 686, 688 (C. C. A. 7). Competition is eliminated where two formerly competing units are brought under one dominating ownership. United States v. So. Pac. Co., 259 U. S. 214, 42 S. Ct. 496, 66 L. Ed. 907; United States v. Union Pacific R. R. Co., 226 U. S. 61, 33 S. Ct. 53, 57 L. Ed. 124.

As has been often announced, the purpose of the provisions of the Clayton Act is to reach unlawful agreements in their incipiency. Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 42 S. Ct. 360, 66 L. Ed. 653. In International Shoe Co. v. Federal Trade Comm., 280 U. S. 291, 50 S. Ct. 89, 91, 74 L. Ed. 431, the Supreme Court required evidence of substantial competition in fact, in order that there may be established an effect upon the public interest, and said:

"Obviously such acquisition will not produce the forbidden result if there be no preexisting substantial competition to be affected; for the public interest is not concerned in the lessening of competition, which, to begin with, is itself without real substance."

The converse is true, and, if there is real substance in the competition, the public interest is affected. In that case, only 5 per cent. of the commodities produced by each company were competitive, while in the instant case 59 per cent. by volume of sales of Hart & Hegeman Manufacturing Company's products competed with Arrow Electric Company products.

In Vivaudou, Inc., v. Federal Trade Comm. (C. C. A.) 54 F.(2d) 273, we found from the evidence that there was no tendency to create a monopoly or to restrain trade and that there was no substantial lessening of competition, for the reason that there was a lack of competitive quantity and quality in the lines of articles produced by the three companies there involved. It appeared that two-thirds of one company's business consisted of talcum powder and a small volume of compacts, whereas the second company had a large sale of compacts and extracts and the third company's principal business was face creams.

But in the instant case we think there was a substantial competition between the two companies acquired by the holding company through stock ownership, with the result that there was a substantial lessening of competition in which the public was interested, and petitioner violated section 7 of the Clayton Act.

Order affirmed.

SWAN, Circuit Judge, dissenting on the ground that the commission's order exceeded its jurisdiction.